(C. D. 1276)

DOLLIFF & McGRATH *v.* UNITED STATES

United States Customs Court, First Division

<br>

(Decided October 3, 1950)

*Henry L. Ziegel* for the plaintiff.

*David N. Edelstein,* Assistant Attorney General (*Richard E. FitzGibbon,* special attorney), for the defendant.

*Joseph F. Lockett* as *amicus curiae.*

*Reuben Hall* as *amicus curiae.*

Before OLIVER, COLE, and MOLLISON, Judges

COLE, Judge: We are concerned here with the importation of one bale of wool in the grease which was classified as wools, not specially provided for, in the grease or washed, under paragraph 1102 (b) of the Tariff Act of 1930, as amended by the General Agreement on Tariffs and Trade, 82 Treas. Dec. 305, T. D. 51802, and assessed with duty at 25½ cents per pound of clean content. The classification was applied on the premise that the importation consisted of wools subject to different rates of duty—i. e., Welsh Mountain wool, *eo nomine* provided for in paragraph 1101 (a) of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1101 (a)), and other wool, not specially provided for—and, therefore, under the provisions of paragraph 1103 of the Tariff Act of 1930 (19 U. S. C. § 1001, par. 1103),[1] the higher rate, applicable to wools in the grease, not specially provided for, under said amended paragraph 1102 (b), was invoked.

Plaintiff claims that the entire bale in question consisted of Welsh Mountain wool and is classifiable under the specific provision for such wool in paragraph 1101 (a) of the Tariff Act of 1930, as amended by the trade agreement with Argentina, 77 Treas. Dec. 138, T. D. 50504,[2] and dutiable at the rate of 13 cents per pound on the basis of clean content.

Two hearings were had, both at the port of Boston where the merchandise was entered. The writer of this opinion presided over the first trial when plaintiff introduced its case, and Lawrence, J., heard

[1] PAR. 1103. If any bale or package contains wools, hairs, wool wastes, or wool waste material, subject to different rates of duty, the highest rate applicable to any part shall apply to the entire contents of such bale or package, except as provided in paragraphs 1101 and 1102.

[2] See the following table:

| United States Tariff Act of 1930; paragraph | Description of article | Rate of duty |
|---|---|---|
| 1101 (a) | Wools: Donskoi, Smyrna, Cordova, Valparaiso, Ecuadorean, Syrian, Aleppo, Georgian, Turkestan, Arabian, Bagdad, Persian, Sistan, East Indian, Thibetan, Chinese, Manchurian, Mongolian, Egyptian, Sudan, Cyprus, Sardinian, Pyrenean, Oporto, Iceland, Scotch Blackface, Black Spanish, Kerry, Haslock, and Welsh Mountain; similar wools without merino or English blood; all other wools of whatever blood or origin not finer than 40s; all the foregoing | |
| | In the grease or washed | 13¢ per lb. of clean content. |
| | Scoured | 16¢ per lb. of clean content. |
| | On the skin | 11¢ per lb. of clean content. |
| | Sorted, or matchings, if not scoured | 14¢ per lb. of clean content. |

the defendant's proof at the second hearing when the case was finally submitted.

My views set forth in *Geo. S. Bush & Co., Inc., et al.* v. *United States*, 22 Cust. Ct. 158, C. D. 1175, questioning the jurisdiction of the division to decide a case somewhat similar to these proceedings, continue as the minority expression from the division. Under the practice and procedure of the court and the rules applicable thereto, much litigation before the court is dependent upon my participation in a decision of the same. Adhering, however, to my views expressed in the *Bush* case, *supra*, but for the purpose of expediting the work of the court, I am preparing this opinion and participating in the decision and the judgment accompanying the same.

The case is purely one of fact, in which both sides have presented interesting evidence. We find the substance of the record deserving this summation.

Plaintiff produced nine skirted fleeces of wool, exhibits 1 to 9, inclusive, representative of the shipment under consideration, and one unskirted fleece, illustrative exhibit A. In addition, plaintiff offered oral testimony of seven commercial witnesses, experienced over a long period of years, beginning prior to the date of enactment of the Tariff Act of 1930 and extending to the time of the importation in question. Their combined testimony is to the effect that Welsh Mountain wool is an indigenous breed of wool, rough in appearance, and consisting of finer bottom fibers (soft undergrowth), with the coarser running to the tips, and kemp throughout the fleece. The proportions of the three kinds or classes of fibers vary in different parts of fleeces but all are positive identifying factors in determining Welsh Mountain wool. No other wool has kemp in the quantity or to the extent existing in Welsh Mountain.

While the characteristics of all fleeces of Welsh Mountain wool are always the same, it is difficult to give qualities because of the strong kemp. The variation in grades is extreme from the britch, showing the largest percentage of coarser fibers, to the neck where the finer fibers are to be found. The present merchandise, ranging in grades from 28s to 58s, is typical, due to the wide variation of commercial texture.

"Skirting" a fleece is to remove the britch, with consequent elimination of a large percentage of coarser fibers, but the withdrawal of the lower grade does not change the fibers *per se*. The operation makes the unskirted fleece, plaintiff's illustrative exhibit A, *supra*, and the skirted ones, plaintiff's exhibits 1 to 9, inclusive, easily distinguishable. Although both sets of exhibits present a somewhat comparative range of grades, the present merchandise, being admittedly skirted, displays more finer fibers than the unskirted fleece, said illustrative exhibit A, where "the britch is still on the skirts,"

and hence contains a greater quantity of coarser fibers and also a lower grade than anything in the wool in question.

Welsh Mountain wool is a matter of sorting and selecting. Accordingly, there is some trade recognition of quality or type numbers, indicative of the character of predominant fibers. For instance, number 1 Welsh Mountain wool is regarded as finer in quality and containing less kemp than number 2. Such and similar designations, however, are not uniform and general throughout the trade. Various grade or type numbers have different significance among wool dealers, but Welsh Mountain wool, with its peculiar kinds of fibers and intermingling of qualities, is always the same. The terms "Welsh wool" and "Welsh Mountain wool" are used interchangeably with reference to Welsh Mountain wool which has been used for apparel purposes and also sold to carpet manufacturers.

The distinction between wool coming from cross-bred sheep and that obtained from native Welsh Mountain sheep is readily discernible, through differences in quality and color, length of the wool, and quantity of kemp. The wool under consideration is Welsh Mountain wool in all of its characteristics. The intermingling of qualities and wide variation of grades are typical. Its color and the presence of kemp throughout are definite identifications. The fine undergrowth mixed with coarser fibers, plaintiff's exhibit 1–A, the locky appearance, plaintiff's exhibit 1–B, so pronounced in fleeces sheared for the first time, and the blunt end, plaintiff's exhibit 8–A, displayed in subsequent shearings, are added features showing the merchandise in question to be Welsh Mountain wool.

Defendant's principal witness is a scientist employed by the United States Department of Agriculture, and, since 1923, has been in charge of the Agricultural Research Center of the Bureau of Animal Husbandry, carrying on research "that has to do with the feeding, breeding, and improvement of sheep and research on fur bearing animals," and working on the "principles of fibre improvement on our own domestic sheep and trying to make a better sheep." His work with wool has always been in connection with technical and scientific phases. He never bought, sold, or dealt commercially in any way, with the commodity. Personal experience with Welsh Mountain wool is very limited. His contact with such wool has been "in a very general way," obtained while he was a student. He saw some Welsh Mountain sheep on a visit to the University of Edinburgh.

The procedure followed by defendant in determining the class of wool under consideration and the results therefrom do not impress us. An ocular examination was made of each of the fleeces in evidence, plaintiff's exhibits 1 to 9, inclusive, and plaintiff's illustrative exhibit A, at the official headquarters of the court in New York, for reaction from the "feel and handle" of the wool. Then a random sample—

i. e., a handful—was removed from a different part of each of the said exhibits and taken to the laboratory in Washington, D. C., for analysis as to fiber fineness and surface structure. In obtaining said samples, no effort was made to take them from any precise location of a fleece, nor to obtain relative portions from the same part of each fleece. None of the samples was weighed and no consideration was given to the different sizes of the various fleeces. That the witness entertained some doubt in the accuracy of the samples seems apparent from the following statement: "If I could have handled the sample in another way, it would have been more uniform if I had the entire fleece to pass through a carding machine and then I could have homogenized the entire fleece, and afterwards you could draw samples from it and you would have a perfect sample."

Actual testing for variations in fineness and diameter of fibers was made, not of the so-called random samples but, instead, from a portion of each mounted on a cross-section device. The results are shown on microphotographs, defendant's collective exhibits C–1 to C–11, inclusive. The tests made by the witness were the usual ones followed in his work on breed-improvement programs.

Attempting to "find out something that would give some sort of standard of just what Welsh Mountain wool was," the witness consulted a book by S. G. Barker, published by His Majesty's Stationery Office in 1931, and accepted therefrom what he regarded as a definition for Welsh Mountain wool. The publication was not offered in evidence nor is it available in the library of the court, but counsel for plaintiff, in his reply brief, has included a copy of the page from the said book, setting forth the table that includes the formula adopted by the witness. That table or tabulation lists 28 British wools showing "the proportionate weight of British pedigree wools obtained *by sorting fleeces* into the various qualities." [Italics added.] The italicized words are to emphasize that the percentages given in the said tabulation were calculated from commercial sortings of fleeces while the witness' results are based on analyses of a few fibers (groups of from 19 to about 50). Discussing the importance of having a fleece or other large representation in sampling wool, the above-mentioned book contains the following:

The determination of sampling errors and the establishment of a technique for sampling is particularly complicated in the case of the fleece. In the first place the greatest variability may exist from lock to lock and from fibre to fibre. It has been shown that it is possible to find on the shoulder of a sheep almost neighbouring locks differing in mean fibre fineness by as much as 25 per cent., a far greater difference than will ordinarily be found between widely different areas of the body and between fleeces that are very different from the point of view of their value. To eliminate this variability it is necessary to take large samples, and to analyse a sample which is made up of a large number of small locks taken from all over the main sample. * * * In certain cases, notably that of

kemp, and possibly that of density of fibres, this geographical variability is so great, over a comparatively small area, that it entirely outweighs any point to point variability of a random nature over small areas. In such a case the sampling procedure must be quite different. It is necessary to undertake. the excessively laborious task of mapping out the distribution of fibre characteristics over the body of many fleeces, and on the basis of the knowledge obtained to select certain definite anatomical areas from which samples are to be taken, to take small samples from these and obtain a figure for each.

This quotation gives more help to plaintiff than support for defendant.

In conjunction with the definition taken from the above-mentioned book, the witness also used, in his procedure testing the wool in question, a 2-ounce sample that he received "In the Fall of 1930," while he was at the University of Leeds in England. That sample was taken from loose wool distributed to students as Welsh Mountain wool for their use in collecting representative types. Its acceptance as Welsh Mountain wool was based on the statement of the men furnishing it. The witness' explanation is as follows: "We have to depend upon the men who are furnishing that sample and the result on that sample and we have to depend upon the history of the published facts, and if they are disregarded, it is just too bad." Whether the wool came from skirted or unskirted fleeces is not disclosed. Nor is there any testimony concerning the particular sort of which the sample is representative. The importance of knowing the quality sort is found in G. S. Barker's book, *supra*, showing five individual sorts of Welsh Mountain wool—i. e., diamond, pick, super, middle, and britch—each possessing individual properties.

The formula or definition adopted by the witness, and the so-called "Leeds" sample, are virtually two different sources of reference as they vary in the range of grades representative of Welsh Mountain wool. The said definition includes grades 28s to 40s only. Its acceptance as absolute for the purposes of this case would require the rejection of the "Leeds" sample, extending from 28s to 70s, as well as the merchandise in question having a range from 28s to 58s. To what extent either of the references was used to the exclusion of the other has not been explained.

The scientific proof presented by defendant is insufficient to contradict plaintiff's competent commercial testimony.

The general manager of the Wool Marketing Association, a selling agency for its sixty to seventy thousand members, also appeared on behalf of defendant. His contact with Welsh Mountain wool was limited to the 4-year period immediately prior to 1930 when he was employed as salesman by a firm that handled such wool. His testimony concerning personal experience leaves much doubt with respect to actual knowledge from a trade standpoint. No idea could be given of the transactions had, nor the quantities handled. Mere

employment with a company dealing in Welsh Mountain wool, but without offering any definite proof of actual participation in commercial transactions, is no basis for testimony regarding characteristics of that particular class of wool.

As a breeder of sheep, the witness' activities have been confined to this country. He has never been to Wales and never saw Welsh Mountain sheep. His understanding about them and cross-breeding was obtained "from reading." The booklet, defendant's exhibit H, titled "Welsh Mountain Sheep," was obtained in 1930 from the Agricultural College of the University of Wyoming. The publication is an official document of the Welsh Mountain Sheep Flock Book Society in Wales, and consists of 20 pages describing Welsh Mountain sheep from the viewpoints of farmers and breeders. An element of its importance herein is found in the chapter "The Wool of Welsh Mountain Sheep," wherein the product of Welsh Mountain sheep is described as "Welsh wool." The expression corroborates plaintiff's oral testimony to the effect that the terms "Welsh Mountain wool" and "Welsh wool" are used interchangeably.

The qualifications of this witness, considered in their entirety, are insufficient for substantial weight to be given his conclusions.

The customs examiner who advisorily classified the wool in question testified that he has been familiar with Welsh Mountain wool "primarily through importations" since 1944 when he assumed his present position. During that time he examined approximately 45 shipments. Prior thereto, and from 1917, he was associated with Government agencies interested in the wool industry, and served in positions that required a knowledge of wool and the necessity to give opinions and advice concerning wool and wool problems. In 1937 and 1938, he, as a wool broker, gained "slight familiarity" with Welsh Mountain wool.

Based on a visual examination of the fleeces in evidence, he stated that plaintiff's exhibits 2 and 8 are native Welsh Mountain wool and the remaining are cross-bred, blooded wools of the Downs type. He was unable to say, however, which of the Downs type or types were represented. By way of explaining his conclusion concerning the exhibits he regarded as cross-bred wool, he selected a piece, defendant's exhibit 4–A, and described it this way: "Here is a piece of wool from Exhibit #4 and the quality of this wool is about 56s. The wool from the bottom of the fleece side to the top is about even. If you take a look at it you will see it has crimp in there and a wave in it, and it has all the indications of a blooded wool. This piece here is very clean and is soft and would compare favorably with wool that we produce here in the United States."

The wool in question was the subject of three advisory classifica-

tions. Between the original and the final one, which was followed by the collector, plaintiff's entered classification as Welsh Mountain wool was accepted and recommended to the classifying officer. The witness acknowledged responsibility for each of said advisory classifications but was unable to give any explanation for the changes in his actions, leaving the impression that the customs officials were doubtful and somewhat uncertain in their consideration of the shipment here in dispute.

The principal deficiency in the testimony of the customs examiner lies in the period of time with which he has been familiar with Welsh Mountain wool. So far as the record discloses, he had no contact with the commodity at and prior to the date of enactment of the Tariff Act of 1930, when the provision for such wool appeared for the first time in paragraph 1101 (a) of the said act. This lack of knowledge or experience with Welsh Mountain wool earlier than the effective date, June 17, 1930, of the tariff act, cannot be overlooked.

That the meaning, hence the scope, of an *eo nomine* designation, like Welsh Mountain wool, is to be determined as of the time of original enactment and prior thereto, is supported by ample authority. *Victor W. Davis, Jr., Administrator, etc.* v. *United States*, 35 C. C. P. A. 79, C. A. D. 374, is in point. There, the subject of litigation was the *eo nomine* provision, "Western white spruce," that appeared for the first time in the Revenue Act of 1938. The prevailing factor, making time of enactment controlling, was the court's recognition that Western white spruce was known in trade and commerce prior to passage of the legislation carrying the provision for the first time.

The same conclusion is applicable herein with respect to Welsh Mountain wool. The preponderance in weight of the evidence establishes that Welsh Mountain wool was known to the trade prior to enactment of the Tariff Act of 1930, that it has always been identified by its peculiar characteristics as hereinabove set forth, that it has been consistently the same, and that the merchandise in question is, in fact, Welsh Mountain wool.

Paragraph 1101 (a), *supra*, both as originally enacted and as amended, enumerates by name 30 wools, including Welsh Mountain. The statutory language is clear and free from ambiguity. Therefore, no reason exists for referring to legislative history. *United States* v. *Shreveport Grain & Elevator Co.*, 287 U. S. 77; *Addison et al.* v. *Holly Hill Fruit Products, Inc.*, 322 U. S. 607; *Armand Schwab & Co., Inc.* v. *United States*, 32 C.C.P.A. 129, C.A.D. 296; *S. Nathan & Co., Inc.* v. *United States*, 37 C.C.P.A. 99, C.A.D. 426; and *United States* v. *Singer Manufacturing Co.*, 37 C.C.P.A. 104, C.A.D. 427.

The protest is sustained and judgment will be rendered accordingly.